# UNITED STATES DISTRICT COURT
### for the
### Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 1:20MJ 141 |
| 2400 MAPLE GROVE LANE, NW, CONCORD, NORTH CAROLINA | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2314 | Interstate Transport of Stolen Property |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1956 & 1957 | Money Laundering |

The application is based on these facts:

See Affidavit of Special Agent Brittany M. Wright..

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Brittany M. Wright
*Applicant's signature*

Brittany M. Wright, Special Agent (USSS)
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 05/26/20

*Judge's signature*

City and state: Greensboro, North Carolina

The Honorable L. Patrick Auld, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## *Property to be searched*

The PREMISES, located at 2400 Maple Grove Lane, NW, Concord, North Carolina, is described as a single-family brick home with two stories. The door of the premises is dark in color and has white trim around the door. The following photograph accurately depicts the exterior façade of 2400 Maple Grove Lane, NW, Concord, North Carolina and its front door:



The VEHICLE is described as a 2008 silver Honda Odyssey EXL with North Carolina registration plate BBA-9225 and Vehicle Identification Number 5FNRL38648B405543. The VEHICLE is accurately depicted in the following paragraph:



*Persons to be Searched*

Shadab A. SIDDIQUI, date of birth December 10, 1977.



Rukshana A. PATEL, date of birth September 14, 1976.



**ATTACHMENT B**

*Property to be seized*

1.     The items to be seized are evidence (including all records), contraband, fruits, and instrumentalities related to crimes committed in violation of 18 U.S.C. § 2314 (Interstate Transportation of Stolen Property), 18 U.S.C. § 371 (Conspiracy), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering) or proceeds from crimes in violation of 18 U.S.C. § 2314 (Interstate Transportation of Stolen Property), 18 U.S.C. § 371 (Conspiracy), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering):

   a. Brand new retail store items, including but not limited to, power tools, vacuum cleaners, kitchen sinks, household electronics goods, and exclusive items sold by retail stores.

   b. U.S. currency.

   c. All financial or financial institution account statements.

   d. All records associated with the purchase or sale of brand new retail store items, including purchase or sale receipts and communication with persons or companies regarding the purchase or sale of brand new retail store items.

   e. Items which tend to show possession, dominion, and control over the PREMISES and the VEHICLE.

f. Items which tend to show evidence of and/or identity of the person(s) committing crimes in violation of 18 U.S.C. § 2314 (Interstate Transportation of Stolen Property), 18 U.S.C. § 371 (Conspiracy), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering).

g. All records relating to the opening or use of financial and financial institution accounts or other financial services in the name of Shadab SIDDIQUI or Rukshana PATEL.

h. Photographs and descriptions of brand-new retail store items which appeared or were intended to appear in eBay sales listings.

i. Any electronic device or electronic storage device capable of storing any of the items listed in this paragraph, including mobile telephones, computers, tablets, thumb drives, external hard drives, or other electronic storage media.

j. Records of the email account: shadab.siddiqui@gmail.com.

k. Records of the the "sidd_2400" eBay store.

l. Records specifically naming the IP address 75.178.132.20

m. Records and information containing the identity or location of other co-conspirators selling stolen items to SIDDIQUI);

2.     Within any electronic device or electronic storage device, items that may be seized include any record of an item listed in Paragraph 1, and:

a. evidence of who used, owned, or controlled the ELECTRONIC DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the ELECTRONIC DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the ELECTRONIC DEVICE of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the ELECTRONIC DEVICE;

f. passwords, encryption keys, and other access devices that may be necessary to access the ELECTRONIC DEVICE;

g. documentation and manuals that may be necessary to access the ELECTRONIC DEVICE or to conduct a forensic examination of the ELECTRONIC DEVICE;

h. records of or information about Internet Protocol addresses used by the ELECTRONIC DEVICE.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>2400 MAPLE GROVE LANE, NW, CONCORD, NORTH CAROLINA<br><br>2008 SILVER HONDA ODYSSEY WITH NORTH CAROLINA REGISTRATION PLATE BBA9225 AND VEHICLE IDENTIFICATION NUMBER 5FNRL38648B405543<br><br>THE PERSONS OF SHADAB A. SIDDIQUI AND RUKSHANA A. PATEL, LOCATED AT 2400 MAPLE GROVE LANE, NW, CONCORD, NORTH CAROLINA | Case No. 1:20MJ141 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Special Agent Brittany M. Wright, with the United States Secret Service, Charlotte Field Office, being duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a Warrant to search:

a. the residence of Shadab Siddiqui, hereinafter SIDDIQUI, located at 2400 Maple Grove Lane, NW, Concord, North Carolina, hereinafter "the PREMISES;" and

b. a 2008 silver Honda Odyssey, owned by SIDDIQUI, with North Carolina registration plate BBA9225, and a Vehicle Identification Number 5FNRL38648B405543, hereinafter "the VEHICLE;"

c. the person of Shadab SIDDIQUI;

d. the person of Rukshana PATEL;

all further described in Attachment A, for the things described in Attachment B.[1]

2.    I am a Special Agent with the United States Secret Service and have been so employed since May 2019. I am therefore an "investigative or law enforcement officer" of the United States within the meaning of Title 18 United States Code, Section 2510(7). I am empowered by law to conduct investigations and to make arrests and seize assets for federal felony violations. I have been part of investigations involving bank fraud, wire fraud and identify fraud.

---

[1] As noted in the search warrant and accompanying application for the persons of SIDDIQUI and PATEL, Attachment B refers in this context only to all items listed in Attachment B that could reasonably be found on the person of Shadab A. Siddiqui or Rukshana A. Patel.

Prior to becoming a Special Agent, I was a contracted Asset Forfeiture Data Analyst with the United States Attorney's Office for the Western District of Virginia and the Drug Enforcement Administration in Roanoke, Virginia.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2314 (Interstate Transportation of Stolen Property), 18 U.S.C. § 371 (Conspiracy), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering) have been committed by SIDDIQUI. There is also probable cause to search the PREMISES, including the electronic devices within it, and the VEHICLE for evidence of these crimes further described in Attachment B.

## PROBABLE CAUSE

### *Background of Siddiqui's eBay Scheme*

5. In January 2020, the Charlotte-Mecklenburg Police Department (CMPD) and United States Secret Service opened an investigation into Shadab SIDDIQUI, for a scheme in which SIDDIQUI buys brand new, in-box items such as vacuum cleaners, from individuals who stole the items from retail stores located in the Charlotte metropolitan area. As part of the scheme,

SIDDIQUI then sells the stolen items at below-retail prices on his personal eBay account.

6.  According to subpoenaed documents received by your Affiant from eBay, SIDDIQUI (named as "Shadab SIDDIQUI" in eBay documents) opened eBay store "sidd_2400," hereinafter EBAY STORE, on or about August 23, 2005. On or about October 31, 2017, the EBAY STORE'S physical address was changed to the PREMISES by someone with access to the EBAY STORE account. The PREMISES is also listed as the shipping address for the EBAY STORE, and shadab.siddiqui@gmail.com, hereinafter the EMAIL ACCOUNT, is the EBAY STORE's email address. Between approximately January 1, 2019, and March 9, 2020 (approximately fifteen months), approximately 1,500 items were listed in and subsequently sold for approximately $330,000.00. The overwhelming majority of those items had sales titles that included the word "new", and almost all of the items were shipped outside North Carolina. Approximately 75% of those items were listed for sale from SIDDIQUI'S home IP address at the PREMISES.[2] As of May 18, 2020, the EBAY STORE has

_____

[2] According to subpoenaed documents received by your Affiant from Charter Communications, IP address 75.178.132.20 was issued to "Shadab SIDDIQUI" at the PREMISES.

approximately forty-nine (49) unique items listed for sale. All but two (2) items are described as "new," and the only used items are refrigerator shelves.

7.    Your Affiant knows that items advertised on eBay's website must be listed by a person using an electronic device capable of connecting to the Internet. Therefore, when items were listed for sale in the EBAY STORE, someone must have connected an electronic device, such as a smart mobile phone, a tablet, or computer, to the Internet using an IP address in order to list the item on eBay's website.

### Interview with Co-Conspirator

8.    On or about January 9, 2020, J.S. was interviewed by Charlotte-Mecklenburg Police Detectives in Charlotte, North Carolina after being arrested for being in possession of a stolen vehicle. J.S., a state-convicted felon for larceny, advised that J.S. used to sell stolen brand new-in-box items to "Tool King" (a Charlotte, North Carolina store that was the subject of a 2018 Interstate Transportation of Stolen Property investigation that resulted in the seizure of more than $1,000,000.00 in stolen new-in-box items in late 2018 by the Charlotte-Mecklenburg Police Department and United States Secret Service).

9.     J.S. admitted to currently selling "most of my stuff [stolen new-in-box items] to" an Indian male that J.S. knows as "SIDD." J.S. advised that he first met "SIDD" after advertising for sale a new-in-box stolen item on an internet marketplace named "OfferUp." According to J.S., "SIDD" offered to purchase more items from J.S., and as a result of their initial meeting, J.S. admitted to continuing to steal new-in-box items from retail stores in Charlotte, North Carolina and specifically that he steals items that "sell the best." J.S. stated that "SIDD" does "not really order up [specific items] but just what resells; resells like on eBay." According to J.S., "SIDD" is always "by himself" and that before J.S. meets "SIDD", "SIDD" sends J.S. "a message on OfferUp or calls and says, 'I want a Dyson or something.'" J.S. also stated that J.S. is "not sure exactly where," but that J.S. "thinks he ["SIDD"] sells it [stolen new-in-box items]".

10.     J.S. advised that he believes that "SIDD" lives in Concord, North Carolina, and has met with "SIDD" in Concord, North Carolina and in southwest Charlotte, North Carolina, on numerous occasions, as many as "three days a week" to sell stolen items to "SIDD." J.S. claimed to never have been to "SIDD's" house, but "SIDD" often wanted to meet J.S. in Concord, North Carolina, to purchase stolen items from J.S.  J.S. advised that "SIDD" drives a gold-colored Camry and a grayish-colored minivan. J.S. admitted that

J.S. usually sells brand new-in-box stolen items to "SIDD" for approximately one-third of the item's true retail price.

### *Surveillance of SIDDIQUI, the PREMISES, and the VEHICLE*

11.     On or about March 11, 2020, another law enforcement officer drove by the PREMISES.[3]   The two-car garage door was open, and the officer observed that the garage was almost completely filled with what appeared to be a large amount of retail store boxes, some of which were clearly observed to be DeWalt tool sets and Dyson vacuum cleaners.

12.     On or about March 17, 2020, another law enforcement officer observed SIDDIQUI leave the PREMISES driving the VEHICLE,[4] remove what appeared to be two new-in-box retail store packages from the VEHICLE,

---

[3] According to law enforcement searches of law enforcement databases, including the North Carolina Division of Motor Vehicles, SIDDIQUI resides at the PREMISES. This has been confirmed through multiple surveillances at the PREMISES by your Affiant and other law enforcement officers in which SIDDIQUI was observed exiting and entering the PREMISES.  Also according to the NC DMV, Rukshana PATEL (hereinafter "PATEL") lives at the PREMISES.  According to an internet-based home sales website, the PREMISES was last sold in approximately 2012; therefore, your Affiant believes that SIDDIQUI has lived at the PREMISES since 2012.

[4] According to the North Carolina Division of Motor Vehicles, SIDDIQUI owns the VEHICLE, which your Affiant and other law enforcement officers have observed parked in the driveway of the PREMISES on multiple dates.

and carry those packages inside the UPS Store located at 8611 Concord Mills Boulevard, Concord, North Carolina (hereinafter UPS STORE).

13. On or about April 27, 2020, another law enforcement officer and your Affiant observed SIDDIQUI leave the PREMISES driving the VEHICLE and drive to the UPS STORE. SIDDIQIUI removed what appeared to be approximately twelve new-in-box retail store packages from the VEHICLE and carried those packages inside the UPS STORE. SIDDIQUI left the UPS STORE empty-handed and then drove the VEHICLE back to the PREMISES.

14. Approximately one hour later on the same day, SIDDIQUI left the PREMISES in the VEHICLE and drove to a Kohl's retail store parking lot located at 8875 Christenbury Parkway, Concord, North Carolina. Approximately several minutes after SIDDIQUI parked in the parking lot, a silver Volkswagen sedan driven by an individual later identified as J.S. parked next to the VEHICLE. SIDDIQUI opened the rear door of the VEHICLE and J.S. removed two SoClean 2 Automated CPAP Equipment Sanitizer Machines, hereinafter CLEANING MACHINES, both of which were in retail store packages, from the Volkswagen and placed the CLEANING MACHINES inside the VEHICLE. SIDDIQUI handed what appeared to be cash to J.S. who then counted the cash. J.S. immediately left the parking lot, and SIDDIQUI drove the VEHICLE back to the PREMISES. The transaction between J.S. and

SIDDIQUI occurred within approximately one minute, and it appeared that J.S. and SIDDIQUI had at least met once before because there was almost no verbal communication between them during the transaction. When SIDDIQUI returned to the PREMISES, another law enforcement officer observed the contents of the PREMISES' garage when the garage door was open, and it appeared that the garage contained numerous new-in-box retail store packages similarly as observed on several previous dates.

15.     Later on the same date, the EBAY STORE'S pre-existing advertisement for CLEANING MACHINES was changed by a person with access to the EBAY STORE. Your Affiant believes that the change made by the person with access to the EBAY STORE was to increase the quantity of CLEANING MACHINES available for sale as a result of SIDDIQUI purchasing two CLEANING MACHINES from J.S. earlier on this date.

16.     On or about May 3, 2020, the EBAY STORE sold several CLEANING MACHINES for approximately $265.00 with free shipping. An internet search revealed the retail price of new CLEANING MACHINES to be between approximately $298.00 and $348.00. Your Affiant knows that when an item is sold through eBay, that eBay deducts an approximate 10% fee from the seller's net proceeds for the sale. Your Affiant also knows that when an item sold through eBay is paid for through PayPal, that PayPal deducts an

approximate 3% fee from the seller's net proceeds for the sale. Your Affiant approximates that the postage cost for a CLEANING MACHINE is $20.00. Therefore, the eBay fee for selling a CLEANING MACHINE was approximately $27.00, and the PayPal fee for selling a CLEANING MACHINE was approximately $8.00. This indicates to your Affiant that the EBAY STORE netted approximately $210.00 for each CLEANING MACHINE after PayPal fees, eBay fees, and the cost of shipping were deducted from the sales price of the CLEANING MACHINES in the EBAY STORE.

17.    On or about May 21, 2020, another law enforcement officer observed the VEHICLE parked in the PREMISES' driveway.

18.    Retail store investigators at Target, The Home Depot, and Lowes provided your Affiant with retail and wholesale prices of items that are exclusively sold by their respective stores that were sold between approximately December 2019 and March 2020 by the EBAY STORE. Your Affiant compared the EBAY STORE's sales price and the EBAY STORE's net

proceeds[5] of each item to the retail and wholesale price of exclusive items[6] sold by the retail stores. With very few exceptions, the EBAY STORE's sales price was between the retail and wholesale price of items, and the EBAY STORE's net proceeds of individual items was below or slightly above each item's wholesale price. Your Affiant knows that Target, The Home Depot, and Lowes are major retail stores in the United States whose respective wholesale purchase prices for items sold exclusively in their stores would be essentially impossible to profitably match through legal means. Therefore, there is probable cause to believe that the only way that the EBAY STORE's net proceeds of items to be comparable to the wholesale price of major U.S. retail stores is for the EBAY STORE's owner to purchase these items from persons who steal or fraudulently obtain the items and sell the stolen items at a severe discount to the EBAY STORE's owner.

---

[5] To summarize how eBay and Paypal are used, when a seller sells an item through eBay and receives payment via Paypal, the seller nets approximately 87% of the sales price of the item because the seller pays eBay a 10% fee and pays Paypal a 3% fee.

[6] Many retail stores sell items that are "exclusive items," which means that only certain brands or certain models of products are available for purchase at particular retail stores. For instance, the brand "Dewalt" manufactures tools that are exclusively distributed to The Home Depot for retail sale to customers.

### *Paypal and Bank of America Accounts*

19.    During the course of the investigation, your Affiant has become aware of the following accounts linked to SIDDIQUI:

a.  Paypal Account XXXXXXXXXXXXXXXX5254, such account held in the name of "Shadab Siddiqui" (hereinafter "PAYPAL ACCOUNT")

b.  Bank of America Account XXXXXXXX0815, such account held in the name of "Rukshana A. Patel" (hereinafter "BANK OF AMERCIA ACCOUNT 1");

c.  Bank of America Account XXXXXXXX7896, such account held in the names of "Shadab A. Siddiqui" and "Rukshana A. Patel" (hereinafter "BANK OF AMERICA ACCOUNT 2"); and

d.  Bank of America Account XXXXXXXX4174, such account held in the name of "Rukshana A. Patel" (hereinafter "BANK OF AMERICA ACCOUNT 3").

(hereafter, collectively, "the Funds").[7]

---

[7] The United States is simultaneously seeking a seizure warrant in the Western District of North Carolina for the Funds and the EMAIL ACCOUNT.

20.     According to subpoenaed documents received by your Affiant from Paypal, SIDDIQUI (named as "Shadab SIDDIQUI" in Paypal documents) opened the PAYPAL ACCOUNT, in or about August 2005. The email address for the PAYPAL ACCOUNT is the EMAIL ACCOUNT, and the physical address for the PAYPAL ACCOUNT is the PREMISES.

21.     According to subpoenaed information your Affiant received from Bank of America, BANK OF AMERICA ACCOUNT 1 is held in the name of "Rukshana A. PATEL," and monthly bank statements are mailed to the PREMISES.   BANK OF AMERICA ACCOUNT 2 is held in the names of "Shadab A. SIDDIQUI" and "Rukshana A. PATEL," and monthly bank statements are mailed to the PREMISES.   BANK OF AMERICA ACCOUNT 3 is held in the name of "Rukshana A. PATEL," and monthly bank statements are mailed to the PREMISES.

22.     The PAYPAL ACCOUNT is linked to BANK OF AMERICA ACCOUNT 1 and BANK OF AMERICA ACCOUNT 2 which your Affiant knows allows SIDDIQUI, or anyone with access to the PAYPAL ACCOUNT, to transfer funds between the PAYPAL ACCOUNT, BANK OF AMERICA ACCOUNT 1, and BANK OF AMERICA ACCOUNT 2.

## *Funding of the Accounts*

23.    Between approximately October 2017 and March 2020, the PAYPAL ACCOUNT received approximately 1,500 individual payments totaling approximately $330,000.00. The majority of the payments totaling approximately $330,000.00 were from persons whose addresses are not in North Carolina and who bought items from the EBAY STORE. Between approximately October 2017 and March 2020, approximately $280,000.00 was transferred from the PAYPAL ACCOUNT to BANK OF AMERICA ACCOUNT 1 and BANK OF AMERICA ACCOUNT 2. Further, during roughly this same time period, cash was withdrawn from BANK OF AMERICA ACCOUNT 1 and BANK OF AMERICA ACCOUNT 2. Your Affiant knows based on her training and experience that "fences" (individuals who buy and sell stolen property) often use cash to purchase such property from "boosters" (individual who steal property for fences to sell). As of March 2020, the balance in the PAYPAL ACCOUNT was approximately $2,848.75.

24.    Beginning in or about March 2019 and continuing at least through April 2020, funds from the PAYPAL ACCOUNT were deposited into BANK OF AMERICA ACCOUNT 1 in monthly aggregate amounts ranging between approximately $9,000.00 and $35,000.00. Beginning in or about March 2019 and continuing through April 2020, cash was withdrawn from Automated

Teller Machines (ATMs) in Concord, North Carolina, near the PREMISES. The withdrawals were drawn on BANK OF AMERICA ACCOUNT 1 in monthly aggregate amounts ranging between approximately $1,200.00 and $4,000.00. As of late March 2020, there was a balance of approximately $7,800.00 in BANK OF AMERICA ACCOUNT 1.

25. Beginning in or about March 2019 and continuing at least through December 2019, funds from the PAYPAL ACCOUNT were deposited into BANK OF AMERICA ACCOUNT 2 in monthly aggregate amounts ranging between approximately $2,000.00 and $15,000.00. Beginning in or about March 2019 and continuing through December 2019, cash was withdrawn from ATMs in Concord, North Carolina near the PREMISES from BANK OF AMERICA ACCOUNT 2 in monthly aggregate amounts ranging between approximately $2,000.00 and $7,000.00. On or about January 17, 2020, approximately $3,000.00 was withdrawn from BANK OF AMERICA ACCOUNT 2 and on or about January 22, 2020, approximately $8,000.00 was deposited from the PAYPAL ACCOUNT into BANK OF AMERICA ACCOUNT 2. As of late March 2020, there was a balance of approximately $4,500.00 in BANK OF AMERICA ACCOUNT 2.

26. Beginning in or about June 2019 and continuing through April 2020, BANK OF AMERICA ACCOUNT 3 received deposits from BANK OF

AMERICA ACCOUNT 1 and BANK OF AMERICA ACCOUNT 2 in monthly aggregate amounts ranging between approximately $2,000.00 and $35,000.00. During this same time period, there were very few transactions other than deposits from BANK OF AMERICA ACCOUNT 1 and BANK OF AMERICA ACCOUNT 2 into BANK OF AMERICA ACCOUNT 3. Based on this pattern of conduct, one or more conspirators appear to use BANK OF AMERICA ACCOUNT 3 as a repository account into which funds from BANK OF AMERICA ACCOUNT 1 and BANK OF AMERICA ACCOUNT 2 are deposited. In total, BANK OF AMERICA ACCOUNT 3 received approximately $210,000.00 from BANK OF AMERICA ACCOUNT 1 and BANK OF AMERICA ACCOUNT 2 between approximately June 2019 and April 2020. As of April 2020, there was a balance of approximately $180,000.00 in BANK OF AMERICA ACCOUNT 3.

27. It does not appear that SIDDIQUI has received income from his employer in BANK OF AMERICA ACCOUNT 1, BANK OF AMERICA ACCOUNT 2 or BANK OF AMERICA ACCOUNT 3. Between approximately September 2019 and December 2019, PATEL received an average monthly income from her employer for approximately $1,400.00 in BANK OF AMERICA ACCOUNT 1. According to BANK OF AMERICA ACCOUNT 1

statements, PATEL has not received any monthly income from her employer as of December 2019.

## DEFINITIONS AND TECHNICAL TERMS

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the

Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

d. eBay is an Internet-based company in the U.S. that allows buyers and sellers to connect and conduct transactions across the world for almost any conceivable item available for sale. eBay allows sellers to list items for sale with photographs and written descriptions of those items, and when a person buys an item, a person may pay for the item via cash, a check, a bank wire transfer, or most commonly, through a Paypal payment. The seller, upon receiving payment, then mails the item to the buyer. If an item is purchased within the U.S. from a seller within the U.S., the seller will generally send the item through the U.S. Postal Service, United Parcel Service, or Federal Express. When a seller sells an item, the seller pays eBay an approximate 10% fee of the sales price.

e. Paypal Holdings, Incorporated (hereinafter "Paypal") is an Internet-based Money Services Business in the U.S. that provides money transfer services for people and companies. Paypal allows users to transfer money between their Paypal accounts, identified by a user's email address and Paypal account number, without sharing financial account information. Users typically link their Paypal account to a credit card, debit card, or bank account(s) so that funds can be debited or credited from the user's credit card, debit card, or bank account(s). A person's Paypal account can hold money, like a typical bank account, until the user transfers the money into his/her bank account. Because payments from one Paypal account to another Paypal account occur almost instantaneously, Paypal is the main method of payment for people to buy items through eBay. When a person receives a Paypal payment for the purchase of an item, his Paypal account is deducted a 3% transaction fee.

## COMPUTERS, CELL PHONES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

29. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in

whatever form they are found. One form in which the records might be found is data stored on electronic devices, such as cell phones or computers or other storage media. Thus, the warrant applied for would authorize the seizure of electronic devices and storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30. *Probable cause.* I submit that if a cell phone, computer, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that electronic device or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that cell phone or computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic device storage media—in particular, internal hard drives—contain electronic evidence of how a computer or cell phone has been used, what it has been used for, and who has used it. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

31.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only cell phone or computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how cell phones or computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. As explained herein, information stored within a computer, cell phone and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

b. A person with appropriate familiarity with how a computer or cell phone works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

c. I know that when an individual uses a computer or cell phone to sell stolen items, the individual's electronic devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how

the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

32.    *Necessity of seizing or copying entire cell phones, computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on electronic devices or storage media often requires the seizure of the item and later off-site review consistent with the warrant. In lieu of removing electronic devices and storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the electronic device's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

33.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic devices or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques,

including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

34.     Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain electronic devices and storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those electronic devices or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

35.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES, including electronic devices, and the VEHICLE described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

**/s/ Brittany M. Wright**

_____

Brittany M. Wright
Special Agent
United States Secret Service

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this _26th_ day of May, 2020, at _9:00 PM_

_____
L. PATRICK AULD
UNITED STATES MAGISTRATE JUDGE